et al. Oral argument, 15 minutes per side. Mr. O'Brien for the appellants. Good afternoon and may it please the court, your honors. Edward O'Brien, on behalf of the appellants, I'd like to reserve three minutes for rebuttal. Fine. Your honor, your honors, we are asking this court to reverse the district court's order   denying GGNSC's motion to compel. In this case, the appellees rely primarily on two cases supporting both their argument and the district court's reasoning for denying the motion to compel. What's up? I'm sorry. The first case is the Badgett case, which I know, Judge Merritt, you are very familiar with, having authored the case. We argue that that case is distinguishable from this case. Namely, the distinction is that in that case, the parties executed a subsequent contract that rescinded their prior arbitration agreement. In this case, we have a circumstance where there is no subsequent executed contract that repudiates that prior agreement. Secondly, the Texaco case, which was relied upon by the district court. In that case, the parties agreed to one thing. The Texaco company leased some equipment to the lessee and the parties entered into a contract where the lessee agreed to assume responsibility for maintaining the equipment. Subsequent to and as part of that contract, the lessee exonerated Texaco of any responsibility for maintaining the equipment and any damage that might result from failing to maintain it. Subsequent to that contract, the parties did the opposite. The lessee assumed, Texaco assumed responsibility for maintaining the equipment and absolved the lessee of that responsibility. And so later, when a dispute arose, Texaco attempted to invoke the exoneration clause in that first agreement, in the party's agreement, and the court of appeals held that the parties had abandoned that prior contract because they took actions that were manifestly inconsistent with what they had previously agreed to. That is not what we have here. We do not have the parties agreeing to one thing in a contract and then doing another in practice. What we have here is a signed arbitration agreement. This court in Badgett acknowledged the breadth of that agreement in terms of the scope. We do not have a novation, as we had in Badgett. The appellees have conceded that there's no novation in this case, as they must because there's no subsequent contract. We have a circumstance where the only document that is at issue here that they're relying on to argue that there is no arbitration agreement is a subsequently presented, unexecuted arbitration agreement. We do not believe that that is sufficient under Kentucky law. Why do you think that if the other agreements bind these parties to arbitration that this unsigned agreement was presented to them? It's got to be on the supposition that they don't have an arbitration agreement. Why would you keep sending them an arbitration agreement when you think you've already got an arbitration agreement? Your Honor, we address this point very candidly in our brief and I'll be very candid with you all here today. Obviously, looking back, I would not have advised them to do that. I would have advised them to have a system in place where they could see if a resident who had previously been admitted had signed an arbitration agreement, then I would have recommended that they not present a subsequent agreement because, as you illustrate or as you indicate, there's no reason to do that. But I don't think that we can... You can certainly make an inference of some kind from doing this that this was not the procedure. Well, there is an affidavit in the record below from the admissions coordinator and she testified in her affidavit that the facility had multiple admissions in a given month and that they did not... She did not necessarily keep track of who had previously signed an arbitration agreement and who had not. So the facility made the judgment apparently that it was easier to include this arbitration agreement in a... It's a pre-printed bound perforated edge kind of book that is presented to each resident. There's not one book that's presented to a resident who's been at the facility before and one book that's presented to those who have not. It's the same book. And so the other... I think the key distinction from Bagehot, which again, Your Honor, is very familiar with, is there's no novation here. There's no subsequent contract. So what do we look to? We look to the language of the party's agreement. There's no question that it's a broad agreement. They refused to sign another contract. Well, I don't know that they refused... They didn't sign another contract. They did not sign another contract. They were presented with one, right? They were presented with one after Mr. Bramer left the facility. He was only there for a day. A subsequent agreement was sent to Mrs. Bramer, Mr. Bramer's power of attorney. She did not sign or return any of the documents that were sent to her and there was more than just an arbitration agreement that was sent to her. So when they went in for that last visit, nothing was signed? There were some documents and I apologize, I don't have the specific documents. There are certain documents upon admission that are necessary to obtain medical treatment. Those documents are presented, according to Ms. Hancock's affidavit, the admissions coordinator at the facility. Those documents are presented immediately upon admission because otherwise the facility cannot treat the resident. Other documents like the admissions agreement, the arbitration agreement, legal documents that are not necessary for medical treatment are typically presented if a resident is admitted late in the evening. They're presented the next day or at the first opportunity that the admissions director has to present them. What is it that you say illustrates the consent of the residents to arbitrate? What is it? Generally speaking or with respect to this particular case? In this particular case we have an agreement that was signed on January 26th of 2015 by Mr. Bramer's power of attorney. I don't believe in this appeal that the appellees are contesting that she had authority to sign for him. I don't think that's at issue here. She signed the agreement for him on his behalf. Why are you saying it's the January 26th one as opposed to the January 5th one? The January 5th agreement, there is a factual dispute between the parties that was unresolved by the district court. The dispute was whether that was in fact Mr. Bramer's signature on the January 5th agreement. The appellees argued that it was not his signature, that someone else must have signed it. The district court did not resolve that factual dispute. What we argued to the district court was the January 26th agreement is identical to the January 5th agreement. There's the same threshold legal issue of whether these prior agreements, regardless of which one we enforce, is to be applied in this case. The signee was not the person, it was his wife, right? Correct, but also his power of attorney. But she signed on the line for resident and she didn't sign as power of attorney for Mr. Yes, and the first thing I would note, obviously this court can consider any grounds for reversal or affirming on appeal, but the district court did not address those arguments. The district court addressed only the abandonment issue. But with respect to that issue, we do address it in our reply brief. There is case law that goes back over 100 years in Kentucky that says that an agent can sign a contract, even in the agent's own name, they can still sign in a representative capacity, even if the person they're contracting with doesn't necessarily at that time know that the person is acting on behalf of a third party. There's numerous cases we cite in our brief to that point. One case that I would point Your Honor's attention to specifically is the Holyfield v. Beverly Health and Rehabilitation case from 2008, which involved this very issue where Judge Haburn said that the fact that the nursing home's relative signed on the resident line and said that she intended to sign as a family member rather than in the capacity as power of attorney, that that was not sufficient to invalidate the agreement because it was uncontested that she had authority to execute the agreement as power of attorney. I want to talk briefly about the distinction between Bagehot because that is primarily, even though there's no novation and that's been conceded, I think that's primarily the issue that the district, or one of the two cases that the district court relied upon in support of its ruling. In Bagehot, we have specific language that tells us the moment that the prior agreement between the parties ceased to be binding. It wasn't the moment when the, and I should mention in Bagehot, one resident was admitted to a nursing home, signed an arbitration agreement, was then admitted to another nursing home owned by the same company, and signed on a declination line saying I decline arbitration. In that case, Judge Merritt authored that opinion. The court held that the parties executed a new contract that superseded their prior contract. I am unaware of any authority in Kentucky or anywhere else that holds that an unexecuted, subsequently presented contract or offered contract covering the same subject matter has the effect of revoking a prior contract simply because it was not signed. You just don't agree with the opinion I wrote, right? Your Honor, obviously the appellants in that case disagreed with Your Honor's ruling, but I don't have to persuade this panel that Bagehot was incorrectly decided here. There's a difference between signing the decline line and simply not executing it. Yes, and I would anticipate an argument that my colleague will make, which is that of course if we just had the first time these parties interacted with each other and Mrs. Bramer or Mr. Bramer decided not to sign an arbitration contract, I would not argue, of course, that his failure or her failure to sign it would bind them to arbitration. What I'm arguing here is they had a prior contract that had a specific method of revocation that was not employed. But was offering them that form, was that an offer to arbitrate? We believe, as the Bagehot court characterized it, that it was an offer to enter into a new contract to either arbitrate or to not arbitrate. The distinction here is they didn't do anything. So if they had, okay, so because they didn't decline it, nothing happened and then you resort back to the old situation? Yes, there is no document that was executed by either party that is inconsistent with the prior agreement. And I would also note that the, as my time is up. Well, isn't offering them a new contract to arbitrate inconsistent with the old contract that said this agreement is binding in perpetuity? Your Honor, may I briefly answer your question? Yes. I don't believe that it's inconsistent with the prior contract in light of the testimony from the admissions director about why that agreement was presented. They simply didn't know that he had previously signed an arbitration agreement. Had they known that, I suspect, although I don't want to speculate, I suspect that they would not have offered that. And I would add that the unsigned arbitration agreement specifically says that it must be signed to be binding on either the facility or the resident. So I'm not sure how we can have an unsigned document that specifically says it must be signed to have any legal effect extinguish a broad arbitration. Does it matter what the parties thought? I mean, you talk about the affidavit of the patient, the admissions person, but what about the plaintiffs? Does it matter how they interpreted it? I think it could matter, Your Honor. And again, my time is up, but I would simply say there's no evidence in the record below whatsoever about the Bramers' intention. The district court simply inferred, based on Badgett and based on Texaco, that the Bramers intended to repudiate their prior arbitration agreement because they didn't return this signed arbitration agreement in July of 2016. Thank you, Your Honors. May it please the Court, Counsel, Jennifer Moore on behalf of the Appellees, Estate of Robert Bramer and his widow, Margaret Bramer. This is not the first time this Court has addressed an issue regarding abandonment of a prior arbitration contract. As Counsel and the Court was just discussing, Judge Merritt's decision in Golden Living v. Badgett, which is the exact same nursing home chain as we have in this case, that case is directly on point. That case, it was multiple admissions, just like what happened in the Bramer case. Every time that Mr. Bramer or Mr. Badgett was admitted into a Golden Living facility, Golden Living presented a new arbitration contract. That act, as this Court has previously held, shows the clear intent of the nursing home to abandon the prior arbitration contract and to offer, to give a choice to the resident or the person acting on the resident's behalf as to whether to arbitrate those claims or not. The nursing home is not required to present a new arbitration contract at each admission. Instead, it chose to do so. Now, Counsel referred to this being in a pre-packaged, I think spiral bound. That's not in the evidence, Your Honors. There is no evidence that this was something where they couldn't have taken it apart or presented just the admission contract and not the arbitration contract. It doesn't matter, Your Honor. It doesn't matter at all. What this Court has previously held is that once they present the arbitration contract, a new arbitration contract, that act under Kentucky law shows their intent to abandon the prior contract. That's exactly what the Texaco Court held. That court, which was Kentucky's highest court at the time, it's the appellate court, but it was in 1969, held very clearly that it's the act or conduct of one party that shows... Sorry, go ahead. Does it matter what she thought or what the plaintiffs thought? It matters as to whether the plaintiff acquiesced in that abandonment. How do we know whether they did or didn't? Because they did not sign the new arbitration agreement. What would have happened if they had wanted to arbitrate? What if they had tried to arbitrate and then would they have a right to arbitrate? No, they would not because that had been abandoned. But that's not the evidence in this case, Your Honor. What the evidence shows us is that the Bramers chose not to sign the new arbitration. They did not, right? And Ms. Bramer kept that document in her records. She maintained it, showing that those lines were blank. Okay, I want to get this straight. But these inferences, is this argument or was there some sort of affidavit that said, I didn't sign it and the reason I didn't sign it is because I didn't want to be bound by it? There is an affidavit in the lower court that Ms. Bramer signed. It was with respect to, at the very beginning, the first petition that the nursing home filed was to enforce the January 5th, 2015 arbitration. Right, and she said that's not anybody's signature, we know. Right, that's not her husband's signature. In that affidavit, she swore that she did receive that admissions contract and arbitration contract the third time, the July 2016, and she stated she did not sign it. So that is in the record. Does it say I didn't sign it because? There's no reason given in that affidavit, Your Honor. But that doesn't matter. The question under the Texaco case, Your Honor, is very clear. And this is what the court said. A contract may be rescinded or discharged by acts or conduct of the parties inconsistent with the continued existence of the contract. And mutual assent to abandon a contract may be inferred from the attendant circumstances and conduct of the parties. So was the contract of the Januaries rescinded simply by the presentation, the re-presentation by the nursing home to the Bramers? Did that, in fact, rescind the arbitration agreement? Yes, Your Honor. When you show that the other party acquiesced in that rescission. So there are two things that have to happen. One is the rescission by the nursing home and the second, the acquiescence or the agreement, either one, by the patient? What I would say is acquiescence, Your Honor. In the Texaco case, it says while as a general rule a contract will be treated as abandoned or rescinded where acts and conduct of one party inconsistent with his existence are acquiesced in by the other party. And so when you look at that, this court has already determined under the Bagehot decision that the act of presenting the new arbitration contract is an abandonment of the January contracts. And then in this case, you have the acquiescence of that by the failing of signing the new arbitration agreement. And I'd like to go back to one of the questions that the panel asked of my colleague, and that is about whether it matters if the Bramers sign that line, we decline to arbitrate. And it does not. What they conceded in their brief is that they would never argue that failing to sign the arbitration agreement would then require the Bramers to have to arbitrate their claims. No, but it's different because they're relying on something that she actually signed. Your response is, well, you can't because once you presented it, it was abandoned. The earlier was abandoned. And your client, you're saying, could not rely on the old one. I mean, how do we know that not signing it wasn't simply a manifestation of a lack of agreement with the whole idea of being presented with a new one? Well, Your Honor, what we know is that under Kentucky law, it's the acts and conduct of the nursing home in this case. And then it's whether it was acquiesced to by the resident or in this case, Ms. Bramer as well. And what we know is that there was no acquiescence. It doesn't matter if she signed on the line declining it because the act of... You're saying there was no acquiescence? No, I'm saying there is acquiescence. I'm sorry if I misspoke. Whether she signed on the line declining or did not sign the contract at all, it's the same effect. But how do you know then? If she doesn't do something, how do you know by mere silence and what conduct, like where is the acquiescence? What constituted the acquiescence? Well, I don't believe there is mere silence in this case because what we have is someone who received a new arbitration contract, did not sign that new arbitration contract, and then kept that arbitration contract that she did not sign in her records. And then when she filed the lawsuit on behalf of her husband's estate, she has that to present to the other side to say... They sent a whole packet of stuff, right, to her house? They sent a folder that has the admissions contract and the arbitration contract. Did she sign anything? There is no evidence that she signed the admission contract or the arbitration contract. These were sent to her house after her husband had already left the nursing home? What's in the record, Your Honor, is that her husband was presented from the hospital to the nursing home in an evening. Around midnight that night, he fell out of the bed, sustained a severe blow to his head, resulting in a brain bleed. The next day, he was at the nursing home for almost the entire day before he was then transferred to a local hospital at the end of the day. There is no evidence in the record as to when this document, this packet was provided to Ms. Framer. We know that it was provided to her. We know that she did not sign that document. We do know that the facility signed that document. The new admissions director at that time signed the document for the new arbitration agreement. And the date on the signature was the date, what date? The date that he was admitted, the date that he was there, or the date that he, I gather he departed from the nursing home that evening? He departed, it was around 24 hours later. It was a little bit under 24 hours. Did he die immediately? No, he did not. He lived for about two weeks after that. Elsewhere? In a hospital, yes, Your Honor. I don't recall that there was a date on that. We did attach the arbitration agreement to, well, I'm not sure if it's attached to the brief, but it is in the record, Your Honor. I don't recall that there is a date on that. I know that the letter that accompanied it did not have a date on it. Going back to whether or not the Bramers needed to sign on that line that said declining the arbitration. The focus under Kentucky law is on the acts and conduct of each party, which can be manifested in different ways. Kentucky law under the Texaco case does not require it to be in writing in order to acquiesce in the abandonment by the nursing home. Why isn't it a question of fact, then? Like, what was the intent? Or what was reasonably understood to be the intent? Well, as the lower court held, Your Honor, that in this case the presentation of the new arbitration contract shows the intent on the part of the nursing home to abandon it. And the lower court found that the acquiescence by the Bramers by not signing that showed that the totality of that was an abandonment of the prior contract. So that finding has been made by the lower court. And that when you abandon the prior contract, there is no valid arbitration contract to then hold the Bramers to enforce them to waive the right to a jury trial in this case. Why do we infer that there's acquiescence rather than inferring that the Bramers were so busy with the terrible events that are happening to Mr. Bramer that they couldn't attend to any paperwork? Well, I don't think you need to infer that, Your Honor. I think what we know is that Mr. Bramer presented with these documents what the evidence in the case or the record shows is that they did not sign that. That in and of itself is the acquiescence in this case. And just to back up a little bit, because the focus as this court held in Badgett is the presentation of the new arbitration contract. As Judge Merritt asked, why do you present a new arbitration contract if you believe that you were already bound to arbitration by the earlier agreement? And Judge Morris, you asked, there's the January 5th agreement, the January 26th agreement. Originally, the nursing home argued that the January 5th agreement should apply and should bound the Bramers to arbitration. That was their original petition. And they said that should apply from hence going forward. Then they amended their petition and said, no, we're not going to argue that. Now we're going to argue that the January 26th agreement, the arbitration agreement, should apply and bind them to arbitration. It is clear that in each admission, this nursing home chain presents a new arbitration agreement thereby giving the residents a choice again as to whether or not they want to choose to arbitrate their claims. And as the court held in Badgett, you can have the right to change your mind. That's what happened in Badgett. This was at a different facility by the same nursing home, the same nursing home in this case. And at that subsequent admission, the resident in that situation elected not to arbitrate his claims at that point. So Badgett called it an implied novation. Is this, in our case, here in front of us, an implied novation? I wouldn't say it is a novation, Your Honor, because we do not have a written contract in this case. In the Badgett case, there was the admission contract that was signed. In this case, we do not have that. What we do have is what we had in Texaco. In the Texaco case, the court determined that there was an abandonment based on the acts and conduct of the party. There was no subsequent contract in the Texaco case. In that case, you had the exoneration clause that said that the store owner was going to have to be responsible for maintaining the equipment. But what happened subsequently to that was that the conduct was that Texaco maintained that equipment over the years. And so when the parties filed suit against Texaco, Texaco then tried to use the exoneration clause to say, well, then we don't have to be responsible for this. And the court rejected that argument hands down and said, no, based on your own conduct, you've abandoned your prior contract and therefore you are held accountable for this. It's the same thing in this case. This court has already held that the nursing home, the very same nursing home chain as in this case, in the Badgett case, presented a new arbitration contract, gave the parties a choice whether to arbitrate, and that act in and of itself abandoned the January contracts. And for these reasons, we would ask that this court affirm the lower court's opinion and find that the petition to compel arbitration be denied and that this case, almost two years later, be allowed to move forward. Thank you, Your Honor. Your Honor, very briefly, I'd like to address the timing issue because I believe that's the key distinction between this case and the Badgett case. Quoting directly from the timing in terms of when exactly the prior agreement, if it was in fact rescinded, was rescinded. In Badgett, quoting, when the parties subsequently entered into the second arbitration agreement, each gave up their contractual obligation to arbitrate. They could not litigate disputes up until that point. That point being the point at which they executed the subsequent contract. Not the point at which GG&SC presented the proposed agreement to Mr. Badgett in that case. The court in Badgett talked at length about why GG&SC did or did not, what their intention was in terms of presenting that subsequent contract. It did not hold as a matter of law that simply by presenting that subsequent contract, that standing alone was sufficient to extinguish the prior one. And I think the point about silence is also critical. Silence is not sufficient to create a contract. I would respectfully submit that it is not sufficient to rescind one either. We have silence in this case. To the extent that we want to construe the nursing home as offering a choice to repudiate a prior arbitration agreement, GG&SC is the master of that offer. They get to say how it is that you exercise that choice. How it is that you accept that offer. They did so by providing a decline line and by saying in the agreement that it's only binding if signed. It's not signed in this case. I would also remind the court that the Stout case from the year 2000, which is the seminal case in this circuit on petitions to compel arbitration, says that if there are doubts about the party's intentions, then we resolve those doubts in favor of arbitration. I would also point out that abandonment must be proven by clear and convincing evidence. So to the extent my colleague is arguing that we should draw inferences from the party's conduct, the question is not what can we infer, the question is what can we prove by clear and convincing evidence. We have a signed, broad arbitration agreement in this case. We have no subsequent contract rescinding that. The last thing that I would like just to point the court attention to is, I do think it is significant that if you look at the record, it becomes clear that these documents were sent to the Bramers after Mr. Bramer left the facility. The cover letter transmitting the documents is not dated, but if you read the letter, it's clear that it was at a time after the Bramers had been at the facility. He was only there for a day. When these incidents, when these events giving rise to this claim occurred, the prior arbitration agreement was in effect. If it was extinguished at all, it was extinguished subsequent to Mr. Bramer's discharge from the facility. We would respectfully ask that this court reverse the district court's order and remand with instructions to compel arbitration. Thank you all very much. Thank you both for your argument. The case will be submitted with the clerk call the next case.